**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| AARON MALDONADO, | CASE NO. 1:24-CV-00415 |
| Plaintiff, | |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Aaron Maldonado ("Plaintiff" or "Mr. Maldonado") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Child Insurance Benefits ("CIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF Doc. 4.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Mr. Maldonado filed applications for CIB and SSI benefits on November 10, 2021, alleging disability beginning on October 1, 1997.[1] (Tr. 10, 244-50, 251-56.) He alleged disability due to mental and physical impairments, including Asperger Syndrome, epilepsy, psoriasis, tinnitus, cirrhosis, and tendonitis. (Tr. 69, 83, 99, 112, 133, 143, 154, 162, 272.) Mr.

---

[1] Mr. Maldonado filed prior applications for SSI and CIB, which were denied and not reopened. (Tr. 10.)

Maldonado's applications were denied at the initial level (Tr. 130-49) and upon reconsideration (Tr. 153-68). He requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 169-70.) The hearing was held on April 6, 2023. (Tr. 40-66.) On April 26, 2023, the ALJ issued a decision finding Mr. Maldonado had not been under a disability within the meaning of the Social Security Act from October 1, 1997, through the date of the decision. (Tr. 7-32.) On January 3, 2024, the Appeals Council affirmed the decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.) Mr. Maldonado then filed the pending appeal. (ECF Doc. 1.) The matter is fully briefed by the parties. (ECF Docs. 7 & 9.)

## II. Evidence

### A. Personal and Vocational Evidence

Mr. Maldonado was born in 1990, making him a younger individual under Social Security regulations on the alleged onset date. (Tr. 25.) He lives with his parents and has never lived alone. (Tr. 51.) His past work is limited to two brief work attempts at Marc's (Tr. 46-47) and odd jobs like mowing lawns (47-48).

### B. Educational Evidence

Mr. Maldonado completed high school and took college classes for about two years at a community college. (Tr. 25, 44-45, 273, 277.) He received special education services from eighth grade through twelfth grade. (Tr. 273, 369-71, 373.)

In May 2008, during Mr. Maldonado's eleventh grade year, his Individualized Education Program ("IEP") team completed a Reevaluation Conference Summary ("Reevaluation Summary"), finding he continued to qualify for: special education services due to his diagnosed seizure disorder; and speech and language therapy. (Tr. 371-74.) The Reevaluation Summary noted teacher reports of a change in Mr. Maldonado's personality beginning in January 2008: he

was more withdrawn, angry, distant, agitated, and paranoid at times; he muttered to himself and guarded his things; he refused to accept help; he appeared tired and spacey; and he had further difficulty focusing in class, following directions, and answering questions on target.  (Tr. 372.)  Mr. Maldonado had a significant increase in migraine headaches during that same time.  (*Id.*)

The Reevaluation Summary also recorded observations and notes from Mr. Maldonado's eighth grade year, when he was first referred for a complete multifactored evaluation, reflecting that his reading, math, and writing skills at that time were "developed to a level commensurate with and above his cognitive ability, which fell within the average range," with a slight weakness noted in his math skills.  (Tr. 373.)  Other observations during the evaluation in eighth grade included: concern regarding Mr. Maldonado's auditory filtering; difficulty performing many gross motor tasks in his physical education class; a severe stuttering disability with average oral expression skills and mildly delayed listening comprehension; well below average to mildly delayed social skills in the classroom; and mildly delayed adaptive skills.  (*Id.*)  The Reevaluation Summary also noted that Mr. Maldonado primarily attended "pull-out special education classes for core academic content" during high school and worked with a private math tutor for a month and a half in tenth grade.  (Tr. 374.)

In April 2009, Mr. Maldonado was in twelfth grade and reported getting B's and C's in school.  (Tr. 453-54.)  He also reported no behavioral problems at school or at home.  (Tr. 454.)

## C.    Relevant Medical Evidence

Although the ALJ identified both physical and mental impairments (Tr. 13), Plaintiff focuses his arguments on his severe mental impairments (*see* ECF Doc. 7).  The evidence summarized herein is therefore focused on Plaintiff's mental impairments during the time periods relevant to his eligibility for CIB and SSI benefits.  The relevant time period for CIB

benefits was September 2008 through September 2012, when Mr. Maldonado was 18 to 22 years old,[2] and the relevant time period for SSI benefits generally began on November 10, 2021.[3]

## 1.  Relevant Treatment Records

On February 10, 2009, Mr. Maldonado presented to Dunya Yaldoo Poltorak, Ph.D., at Cleveland Clinic's Center for Pediatric Behavioral Health for a consultation regarding chronic headaches.  (Tr. 461-62.)  He reported that he had headaches that could last a few hours after school about three days a week, and occasionally had difficulty concentrating, slurred speech, and dizziness during a headache.  (*Id*.)  Dr. Poltorak observed that Mr. Maldonado had a "cognitively slow style" and "trouble following comments or directions that had more than one step."  (*Id*.)  Dr. Poltorak noted that Mr. Maldonado was "appropriately responsive to the extent he understood."  (*Id*.)  Dr. Poltorak was informed that Mr. Maldonado achieved average grades in school, participated in the school's choir and environmental club, and also participated in faith-related activities for youth.  (*Id*.)  Mr. Maldonado denied symptoms that were suggestive of mood concerns but noted occasional anxiety when speaking in front of others.  (*Id*.)  He denied "peer conflict" or being the "victim of peer teasing."  (*Id*.)  Dr. Poltorak indicated that it was "difficult to get a clear sense of his overall functioning, in part [due to] difficulty getting info from his mom."  (*Id*.)  Dr. Poltorak introduced a cognitive behavioral approach to physical symptom management and suggested additional appointments.[4]  (*Id*.)

---

[2] Social Security regulations provide for the payment of disabled child's insurance benefits if the claimant is 18 years old or older and has a disability that began before attaining age 22.  *See* 20 C.F.R. § 404.350(a)(5).

[3] Social Security regulations provide that the earliest month for payment of SSI benefits is the month after the application for benefits was filed, 20 C.F.R. § 416.335, although the medical record is generally developed for twelve months preceding the application date, unless an earlier or later date is necessary, 20 C.F.R. § 416.912(b)(1).

[4] Mr. Maldonado continued to see Dr. Poltorak in February and March, reporting improvement in his headaches. (Tr. 455, 457.)  Dr. Poltorak worked with Mr. Maldonado on the use of cognitive-behavioral strategies to help with stress, pain management, and control of his stuttering.  (*Id*.)  During a follow-up appointment with Dr. Poltorak on March 23, 2009, Mr. Maldonado reported that his "[h]eadaches remain[ed] entirely absent" and he felt "much less anxious."  (Tr. 455.)  He and his mother reported no new concerns.  (*Id*.)  Their insurance was going to run out soon

Mr. Maldonado also treated with Irwin Jacobs, M.D., a pediatric neurologist at Fairview Health Center, for his seizure disorder and migraines.  (Tr. 354.)  During visits with Dr. Jacobs in 2009 and 2010, Mr. Maldonado reported he was attending Tri-C.  (Tr. 354, 357, 359.)  On examination, he was observed to be pleasant and friendly.  (*Id*.)  In December 2010, he said he was volunteering at FVH (Fairview Hospital).  (Tr. 355; *see* Tr. 377.)

In March 2012, Mr. Maldonado presented to Richard Litwin, Ph.D., for a psychological evaluation following a referral from the Bureau of Vocational Rehabilitation.  (Tr. 383-86.)  Dr. Litwin's clinical findings and medical opinions are discussed in Section II.C.2.i.a., *infra*.

In July 2012, Dr. Jacobs met with Mr. Maldonado's mother to discuss her concern that Mr. Maldonado was "indifferent and incapable of finding a job, and eventually living on his own."  (Tr. 439.)  Dr. Jacobs felt the family needed counseling to obtain guidance on how to handle the situation.  (*Id*.)  Although Mr. Maldonado had seizures and migraines, Dr. Jacobs felt the main issue was Mr. Maldonado's behavior; he indicated it had long been his impression that Mr. Maldonado had Asperger Syndrome, but that it was "very difficult to approach this diagnosis with the family."  (*Id.*)  He noted that he would try to find a mental health professional to speak with the family.  (*Id*.)

Mr. Maldonado returned to Dr. Jacobs the following month, on August 6, 2012.  (Tr. 438.)  On examination, Mr. Maldonado was pleasant and friendly, but his speech was stuttered and rapid.  (*Id*.)  He did not always stay on topic or listen and respond appropriately to conversations, and most of his answers were vague and indefinite.  (*Id*.)  Mr. Maldonado said he was no longer volunteering at FVH and Dr. Jacobs encouraged him to return.  (*Id*.)  Mr.

---

and there was no immediate need for follow up.  (*Id*.)  Given Mr. Maldonado's age and the fact that he would be graduating soon, Dr. Poltorak advised him to follow up with an adult service provider if the need arose.  (*Id*.)

Maldonado also said he was working on a computer game, which Dr. Jacobs observed seemed to occupy a lot of his time.  (*Id.*)  Mr. Maldonado's mother continued to express her concern that Mr. Maldonado was "indifferent and incapable of finding a job, and eventually living on his own."  (*Id.*)  Dr. Jacobs noted his long-standing impression that Mr. Maldonado had Asperger Syndrome and the difficulty of approaching the family about the diagnosis; he suggested an evaluation by Dr. Stephen Ruedrich.  (*Id.*)

Mr. Maldonado later presented to Dr. Ruedrich for a psychiatric diagnostic examination on February 26, 2013, five months after Mr. Maldonado turned 22.  (Tr. 390-97.)  Dr. Ruedrich's clinical findings and medical opinions are detailed in Section II.C.2.i.b., *infra*.

Following Mr. Maldonado's application for SSI benefits in November 2021, Mr. Maldonado continued to seek treatment for physical impairments like seizure disorder, psoriasis, and hypertension in 2022 and 2023.  (Tr. 643, 652, 664, 687, 733, 772.)  Clinical examination findings during those visits described him at various times as alert (Tr. 645, 652, 687, 735), interactive, and cooperative (Tr. 645).  At times, his affect was observed to be appropriate (*id.*) and his mood and affect were described as pleasant (Tr. 652, 687) and normal (Tr. 776).  His judgment and insight were also observed to be normal.  (Tr. 735.)

### 2. Relevant Medical Opinion Evidence

#### i. Treating / Independent Psychological Evaluations

##### a. Richard Litwin, Ph.D.

On March 5, 2012, Mr. Maldonado presented to Richard Litwin, Ph.D., for a psychological evaluation following a referral from the Bureau of Vocational Rehabilitation.  (Tr. 383-86.)  Mr. Maldonado was 21 years old.  (Tr. 383.)  He lived with his parents and had few friends.  (*Id.*)  Dr. Litwin was told that Mr. Maldonado needed some help with activities of daily

living, might need reminders to take medications, did not cook, could not budget, did not drive, and might need help learning to take the bus.  (*Id*.)

Dr. Litwin administered the WAIS-IV and Wide Range Achievement Test-4 (Green Form) ("WRAT-4"), and Mr. Maldonado also completed a Symptom Checklist 90-R to assess emotional functioning.  (Tr. 384.)  WAIS-IV testing revealed the following scores: full-scale IQ of 82; verbal comprehension index of 95; perceptual reasoning index of 90; working memory index of 83; and processing speed index of 71.  (*Id*.)  Dr. Litwin concluded that Mr. Maldonado's overall IQ scores were affected by his slow processing speed which fell within the borderline range.  (*Id*.)  His full-scale IQ score put him in the "low average" range.  (*Id*.)  On WRAT-4 testing, Mr. Maldonado showed poor command of basic math and his word reading and spelling fell within the late high school level.  (*Id*.)  On the symptom checklist, in contrast to Mr. Maldonado's mother's report that Mr. Maldonado was doing "'fine' emotionally," Mr. Maldonado "cited significant to extreme problems with anxiety and depression."  (*Id*. (emphasis in original removed).)  Dr. Litwin indicated that Mr. Maldonado "seem[ed] to be paralyzed by anxiety," indicating: "He bites his finger nails, feels constantly nervous, worries about making a mistake, feels scared for no reason and has trouble making decisions."  (*Id*.)  His reported depressive symptoms included: "negative ruminations, feelings of worthlessness, lack of motivation, feeling inferior and thoughts of hopelessness."  (Tr. 384-85.)

Dr. Litwin diagnosed Mr. Maldonado with: major depression, single episode, severe; generalized anxiety disorder with social discomfort; and mathematics disorder.  (Tr. 385.)  Dr. Litwin assessed a GAF score of 55 (moderate to severe).  (*Id*.)  He opined that Mr. Maldonado had a focal learning disability involving math, indicating that he had only mastered the four main math operation procedures with skills at the fourth-grade level.  (*Id*.)  He further opined that Mr.

Maldonado's parents appeared to be in denial about their son's emotional functioning because Dr. Litwin found him to be severely depressed with strong anxious features and significant under-socialization with a tendency to spend most of his down time on the computer.  (*Id*.)  Dr. Litwin felt that Mr. Maldonado needed "immediate emotional intervention with family counseling," and indicated that his family system was not helping him move toward greater emancipation.  (*Id*.)  Dr. Litwin opined that Mr. Maldonado's functional limitations included: "poor self-direction, low math skills, poor interpersonal skills with social awkwardness, poor mental perseverance and determination, and limited work skills."  (*Id*.)

### b.      Stephen L. Ruedrich, M.D.

On February 26, 2013, at the request of Mr. Maldonado's parents and upon referral from Mr. Maldonado's neurologist Dr. Jacobs, Mr. Maldonado presented to Stephen L. Ruedrich, M.D., at University Hospitals for an evaluation.  (Tr. 390-97.)  Dr. Ruedrich's evaluation included a lengthy interview with Mr. Maldonado's parents, a psychiatric diagnostic examination of Mr. Maldonado, and a review of August 2012 progress notes from Dr. Jacobs.  (Tr. 390.)

Mr. Maldonado's parents expressed concern that their son spent "most of his waking hours online; and/or working with his computer in his bedroom" and had been unable and unwilling to work outside the home since completing his formal education.  (Tr. 390-91.)  They also expressed concern that their son was "increasingly isolated" and withdrawn.  (Tr. 391.)  They thought he might be "sad, or depressed," and noted that he "rarely smile[d]" but did not usually cry.  (*Id*.)  He occasionally became irritated at his parents.  (*Id*.)  Mr. Maldonado reported that he had been working on a project that involved "inventing and developing a new video game, which he hope[d] [would] provide a way to support himself."  (*Id*.)  He said it was a "Sci-Fi fantasy online game" and that he had the "skills and lots of research."  (Tr. 392.)  Mr.

Maldonado's parents did not feel their son's plan was "reasonable or [a] likely outcome of his computer use." (Tr. 391.) They reported that when they had "pushed him to leave the house to seek work, he [became] very very anxious, and at times, irritable." (*Id*.) They said their son would talk to himself at times and his speech was sometimes jerky and stuttering. (Tr. 392.) They also said they observed some paranoia and obsessive tendencies from their son. (*Id*.)

Mr. Maldonado said he "felt frozen" and was depressed during high school, and felt he was not going to be able to accomplish anything. (Tr. 392.) More recently, he had been sad, angry, tired, and anxious. (*Id*.) He denied suicidal ideation or a desire to harm others, but said he sometimes heard voices that called his name or asked him to come. (*Id.*) The voices did not ask him to do anything dangerous. (*Id*.) He said he had a girlfriend in high school for a year and a half, and met a woman online more recently; no other relationships were reported. (*Id*.)

On mental status examination, Mr. Maldonado was neatly dressed and groomed but entered the interview room with some reluctance. (Tr. 395.) His eye contact was intermittent throughout the evaluation and he demonstrated psychomotor anxiety by shifting positions and rubbing his hair repeatedly. (*Id*.) He had a significant stutter, flattened affect, and depressed mood. (*Id*.) His associations were idiosyncratic and odd at times. (*Id*.) He did not appear paranoid or to be hallucinating. (*Id*.) He was oriented to the day of the week, month, date, and year. (*Id*.) He could remember two of two items shown and then hidden, and three of three items given verbally. (*Id*.) He showed some mild left-right reversal. (*Id*.) He could do single digit addition and subtraction in his head but had limited multiplication ability. (*Id*.)

Dr. Ruedrich diagnosed Mr. Maldonado with: psychotic disorder, schizophrenia undifferentiated vs. psychosis NOS; pervasive developmental disorder NOS; obsessive compulsive disorder; and psychosis associated with medical condition (epilepsy). (*Id*.) Dr.

9

Ruedrich concluded that Mr. Maldonado had "a complex co-morbid psychiatric and neurological condition" and "appear[ed] to have an underlying pervasive developmental disorder, which might be characterized as Asperger's disorder (high functioning autism)" but did "not seem to have intellectual disability."[5]  (Tr. 395-96.)

Dr. Ruedrich opined that Mr. Maldonado appeared to have a recent onset of a co-morbid psychiatric illness over the prior four to five years, with features of mood and thought disorder; this was based on Mr. Maldonado's description of a period of increased symptomatology when in high school, mostly characterized with mood symptoms (depressed mood, anhedonia, low energy, inability to initiate  activity or concentrate, and passive thoughts of death or suicide). (Tr. 396.)  Dr. Ruedrich noted that this episode seemed to last for several months to a year, and remitted, possibly due to some supportive therapy with a psychologist he saw briefly.  (*Id*.)

As it related to present situation, Dr. Ruedrich concluded that Mr. Maldonado seemed to have more symptoms and signs of thought disorder, noting that: he admitted to having auditory hallucinations of voices and his parents observed him talking to himself and laughing out of context; he had been mildly paranoid at times; he demonstrated some bizarre thinking; he had been obsessed with his work on the computer; he had significant sleep/wake cycle problems; he was distracted on exam, and had difficulty with making explanations for his recent behavior. (Tr. 396.)  Dr. Ruedrich opined that the "most statistically-likely explanation for this set of symptoms would be a psychotic illness like schizophrenia, or schizoaffective disorder."  (*Id*.)  He also opined that "[o]ther diagnostic options would be a mood disorder with psychotic features . . . [or] a psychotic illness that is part of his epilepsy."  (*Id*.)  Dr. Ruedrich also noted that Mr. Maldonado had "a number of features of obsessive compulsive disorder."  (Tr. 396.)   He opined

---

[5] Dr. Ruedrich estimated Mr. Maldonado's intellectual ability fell in the low-average to average range, noting it would be helpful to obtain available neuropsychological or IQ tests results to confirm this impression.  (Tr. 395-96.)

that some of Mr. Maldonado's obsessive behaviors might be explained by his autism spectrum disorder.  (*Id*.)

Dr. Ruedrich's recommendations included further psychological testing, consideration of psychotropic treatment and reestablishing contact with the county board of developmental disabilities, which Dr. Ruedrich felt could be helpful to assist Mr. Maldonado with finding vocational and/or residential opportunities in the future.  (Tr. 396.)

### ii.     Consultative Psychological Examiners

### a.     Deborah Koricke, Ph.D.

In connection with a prior application for SSI benefits, Mr. Maldonado presented to Deborah Koricke, Ph.D., for a consultative psychological evaluation on June 23, 2009.  (Tr. 339-45.)  He was driven to the evaluation by his mother and arrived on time.  (Tr. 340.)

Mr. Maldonado said he was significantly impaired due to speech problems and epilepsy, received special education instruction while in school, and had graduated from high school that month.  (Tr. 340.)  He reported no behavior problems and no suspensions while in school.  (*Id*.)  He was planning on attending Cuyahoga Community College in the fall.  (*Id*.)  He said he had never worked.  (*Id*.)  He was looking for work, but said he felt he would not be able to work as long as he was on medication for epilepsy.  (*Id*.)

Mr. Maldonado reported a history of depression during his sophomore year in school, stating: "'I lost all my friends.'"  (Tr. 340.)  But he also reported having friends with whom he socialized.  (Tr. 343.)  He described his typical mood as "'sad, confused, and fearful.'"  (Tr. 340.)  He reported some problems with concentration and memory, said he had anxiety, and said he was "'occasionally nervous.'"  (*Id*.)  He reported participating in a few family counseling sessions in the past, but said he was not receiving treatment for mental health conditions.  (*Id*.)

He denied suicidal or homicidal ideation and hallucinations.  (*Id.*)  He said he was able to care for his personal hygiene and perform household chores daily.  (*Id.*)  On a typical day, he watched television, used the computer, and prayed.  (Tr. 343.)  When he was in school, he would come home from school and do homework and chores until dinner.  (*Id.*)

On mental status examination, Mr. Maldonado's appearance was good.  (Tr. 341-42.)  He was neat, clean, polite, cooperative, pleasant, and good-natured.  (Tr. 342.)  There was no evidence of attention deficits during the evaluation and Mr. Maldonado put forth good effort on all tasks.  (*Id.*)  He appeared motivated to do well and was eager to please.  (*Id.*)  But he showed significant speech problems, with a stammer and stutter, and reported that his stuttering was worse when he was upset or anxious.  (*Id.*)  His responses to questions were generally appropriate, he asked questions when necessary, and his thinking was logical and linear.  (*Id.*)

Mr. Maldonado was anxious during the session and Dr. Koricke observed that his stuttering was noticeably worse when he was talking about his feelings and anxiety.  (Tr. 342.)  He reported problems with anxiety and worry, especially if he felt he made a mistake, but denied fears, phobias, and panic attacks.  (*Id.*)  He appeared "somewhat depressed," lacked animation in his facial expression, and had a blunted affect, but his affect appropriately matched the content of his speech, his tone was normal, and he maintained good eye contact.  (*Id.*)  He denied crying spells and denied evidence of mania.  (*Id.*)  His energy level was within normal limits, he reported no suicidal or homicidal ideation, and he denied thoughts of worthlessness, hopelessness, helplessness, or guilt.  (*Id.*)  Dr. Koricke observed that Mr. Maldonado demonstrated mild difficulty interacting with others during the evaluation due to his depressed mood, anxiety, and stammering and stuttering.  (Tr. 343-44.)  She also observed that he was a little shy but put forth a consistent effort to interact.  (Tr. 344.)

12

Mr. Maldonado was alert during the evaluation.  (Tr. 342.)  His memory for history was

adequate.  (*Id*.)  The Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") was

administered.  (Tr. 340, 343, 345.)  WAIS-IV testing revealed the following scores: full-scale IQ

of 92; verbal comprehension index of 95; perceptual reasoning index of 98; a working memory

index of 95; and a processing speed index of 84.  (Tr. 343, 345.)  Dr. Koricke found that Mr.

Maldonado's testing fell within the average range of intellectual functioning, which she viewed

as a valid representation of his intellectual abilities.  (Tr. 343.)

Dr. Koricke diagnosed Mr. Maldonado with depressive disorder, NOS, and

communication disorder, NOS (Tr. 343) and provided the following opinions regarding the four

work-related mental abilities:

> The claimant's mental ability to relate to others, including fellow workers and
> supervisors is moderately impaired due to depression, anxiety, and
> stuttering/stammering.  He does appear to get anxious and then his stuttering
> increases.  He also appears somewhat depressed, and this would affect social
> interactions and understanding social cues.
>
> The claimant's mental ability to understand, remember and follow instructions is
> not impaired, based on my test results and interactions here today.
>
> The claimant's mental ability to maintain attention, concentration, persistence and
> pace to perform simple repetitive tasks is generally not impaired.
>
> The claimant's mental ability to withstand the stress and pressure associated with
> day-to-day work activity is mildly to moderately impaired due to depression,
> anxiety, and a communication disorder.  He appears to get easily stressed, which
> then causes his stuttering to worsen.

(Tr. 344-45.)

### b.    Kenneth Gruenfeld, Psy.D.

In connection with a prior application for SSI benefits, Mr. Maldonado presented to

Kenneth Gruenfeld, Psy.D., for a consultative psychological evaluation on March 7, 2011.  (Tr.

376-81.)  He arrived for the evaluation alone and on time.  (Tr. 376.)  He said he was filing for

disability because he had epilepsy and was "really anxious." (*Id*.)  He reported being enrolled in special education services starting in eighth grade due to epilepsy and poor grades in elementary school.  (Tr. 377.)  He said he was well behaved in school and completed one year at a community college.  (*Id*.)  He reported never working a paid job; he said he had been looking for a year, but no one would hire him.  (*Id*.)  He had volunteered at Fairview Hospital one day per week for three years, delivering items to patients and staff, transferring patients, and cleaning the hospital.  (*Id*.)  He denied problems with coworkers or supervisors in his volunteer role and reported no issues understanding his job tasks.  (*Id*.)

Mr. Maldonado denied a history of depression, hallucinations, delusional ideation, mania, and paranoid thoughts.  (Tr. 378.)  He also denied a history of mental health treatment or psychotropic medications.  (*Id*.)  During the evaluation, Dr. Gruenfeld observed that Mr. Maldonado was "extremely anxious"; his body and hands constantly shook.  (*Id*.)  When Dr. Gruenfeld asked Mr. Maldonado about the shaking, Mr. Maldonado said he got nervous at times and also got cold; he said he was cold during the evaluation.  (*Id*.)  He also reported tension at home, explaining that he was anxious and nervous when he was in his house and felt better when he was out of the house.  (*Id*.)  He reported a history of physical abuse (Tr. 376-77) but denied violence in the home and denied a history of panic attacks (Tr. 378).  Mr. Maldonado reported he was able to perform activities of daily living and complete chores at home without assistance, but said he often skipped these activities when he was anxious.  (*Id*.)

On mental status examination, Mr. Maldonado's personal hygiene and grooming were fair.  (Tr. 378.)  He was polite and cooperative.  (*Id*.)  His task motivation and task persistence, attention, concentration, and responses to direction and redirection were good.  (*Id*.)  His speech was normal, and his conversation was logical and topic directed with some spontaneous

elaboration.  (Tr. 378-79.)  There were no difficulties noted with expressive or receptive language skills.  (Tr. 379.)  Mr. Maldonado's eye contact was fair.  (*Id*.)  His affect was appropriate to the situation and he did not appear sad, endorse suicidal or homicidal thoughts, or show signs of anger or irritability.  (*Id*.)  But he admitted being anxious and showed signs of anxiety during the evaluation.  (*Id*.)  He denied hallucinations, paranoid thoughts, or delusional thinking.  (*Id*.)  His concentration and attention skills were adequate.  (*Id*.)  He appeared to have some insight and judgment regarding his medical conditions and future planning.  (*Id*.)

Dr. Gruenfeld diagnosed Mr. Maldonado with adjustment disorder with anxiety, with a note to rule out generalized anxiety disorder.  (Tr. 381.)  He assessed a global assessment of functioning (GAF) score of 65.  (*Id*.)  With respect to Mr. Maldonado's functional abilities, Dr. Gruenfeld opined that Mr. Maldonado would not likely have problems in the areas of: understanding, remembering, and carrying out instructions; or maintaining persistence and pace to perform simple and multi-step tasks.  (Tr. 380-81.)  With respect to maintaining persistence and pace, Dr. Gruenfeld observed that there was "no evidence of problems with attention and concentration during [the] evaluation, even as the claimant was obviously experiencing problems with anxiety."  (Tr. 381.)  With respect to Mr. Maldonado's ability to respond appropriately to supervision and coworkers, Dr. Gruenfeld identified no limitations, and noted that Mr. Maldonado reported no problems with coworkers, did not indicate that anger or aggression was a symptom of his anxiety, and was polite and respectful during the evaluation.  (*Id*.)  With respect to Mr. Maldonado's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Gruenfeld noted that Mr. Maldonado said he handled pressures at home by talking to friends or spending time by himself out of the house and isolated at work if he felt

stressed.  (*Id.*)  He also noted that there was no reported history of mental or emotional deterioration in response to work exposure.  (*Id.*)

### c.    Brian Krabbe, Psy. D.

On April 25, 2022, Mr. Maldonado presented to Brian Krabbe, Psy.D., for a consultative psychological evaluation.  (Tr. 672-77.)  No psychological testing was requested or performed. (Tr. 675.)  When asked about the nature of his disability, Mr. Maldonado stated: "I might have Asperger's."  (Tr. 672.)  He reported that his family encouraged him to apply for disability.  (*Id.*)

With respect to his educational background, Mr. Maldonado reported that he completed high school and some college courses.  (Tr. 673.)  He reported a few suspensions while in school but said he got along adequately with his teachers and peers.  (*Id.*)  He was not required to repeat a grade and generally received B's and C's in school.  (*Id.*)  He said he had problems focusing while in school but was not prescribed ADHD medication.  (*Id.*)

Mr. Maldonado reported working twice as a grocery store stocker; the first job lasted 28 days and ended as part of a large layoff and the second job lasted 38 days and ended due to Mr. Maldonado misunderstanding his schedule and failing to show up for work.  (Tr. 674.)  Mr. Maldonado reported no difficulty learning the jobs, staying focused, and performing tasks in a timely manner.  (*Id.*)  He got along well with supervisors and coworkers, but noted problems managing stress at work, stating: "I would get overwhelmed and sit down or wonder."  (*Id.*)

Mr. Maldonado reported a history of mental health treatment, including counseling, but said he was not currently using psychoactive medication.  (Tr. 674.)  He described his "current emotional functioning" as:

> Overall good.  I have some concerns.  Goals and concerns I try to focus on…Most of the time I'm in good spirits.  Sometimes I have frustrations and things don't go that well…I don't feel worthless…I feel like some people judge me…Sometimes I

line things up…Loud noises bother me…I do get upset if my routine changes…I love creating 3D art.

(*Id.* (ellipses in original).)  In discussing his mental health complaints, Dr. Krabbe observed that Mr. Maldonado "endorsed common symptoms of an Autism Spectrum Disorder," which included: deficits in social-emotional reciprocity, deficits in nonverbal communication, deficits in developing and maintaining relationships, repetitive patterns of behavior, inflexible with rigid adherence to routines, having fixated interests that are abnormal in intensity or focus, and hyper-reactive to sensory input.  (*Id.*)  Dr. Krabbe also observed that Mr. Maldonado presented with limited eye contact.  (*Id.*)  He denied current suicidal or homicidal ideation and denied past suicide attempts, but reported a history of suicidal ideation.  (*Id.*)

Mr. Maldonado lived with his parents and spent most of his time watching television.  (Tr. 674.)  He was able to care for his personal hygiene, perform household chores, shop for groceries, and prepare basic meals.  (*Id.*)  He had problems remembering appointments and medication.  (*Id.*)  He never had a driver's license.  (*Id.*)  He had few friends.  (*Id.*)

Mr. Maldonado was driven to the evaluation by his father and arrived on time.  (Tr. 674.)  Dr. Krabbe recorded the following mental status findings.  (Tr. 674-75.)  His grooming and hygiene were adequate.  (Tr. 674.)  He was cooperative and rapport was adequately established.  (*Id.*)  His energy appeared adequate, and he moved at an appropriate rate of speed.  (Tr. 674-75.)  He understood the purpose of the evaluation, did not appear to exaggerate or minimize his problems, and appeared to put forth good effort toward completing tasks.  (Tr. 675.)  His conversation speed was within normal limits, with no indication of loose associations, flight of ideas, or delusions.  (*Id.*)  He had no problems attending to simple instructions.  (*Id.*)  His affect was flat, but he expressed no imminent or acute suicidal thinking, and he showed no signs of

anger or hostility.  (*Id.*)  He showed no autonomic or motoric indications of anxiety.  (*Id.*)  As to

Mr. Maldonado's sensorium and cognitive functioning, Dr. Krabbe observed that:

> Mr. Maldonado was alert, responsive and oriented to time, place, person, and
> situation. He did not appear confused. In terms of immediate memory, he recalled
> 6 digits forward. On a slightly more complex task of immediate memory that also
> assesses attention, he recalled 4 digits backward. The ability to recall 4 digits
> backwards is considered average. In terms of short-term memory, he was able to
> recall 1 of 3 words after a brief delay. In terms of long-term memory, he was able
> to identify the past three presidents. He displayed no difficulty recalling aspects of
> his upbringing. Mr. Maldonado had no difficulty following conversationally or
> responding to direct questions. In terms of attention and concentration, he was able
> to count backwards from 100 by 7s for 4 iterations in 30 seconds with zero errors.
> Scores of five or more iterations suggest adequate attention and concentration. On
> a slightly simpler task of attention and concentration, he was able to count
> backwards from 20 by 3s in 12 seconds with zero errors. Scores of 15 seconds or
> less suggest adequate attention and concentration. In terms of working memory, he
> had some difficulty calculating division and fractions. In terms of abstract
> reasoning abilities, he was asked to describe similarities between two words and
> scored in the average range. Mr. Maldonado explained that the saying, "What goes
> around comes around," means, "If someone does something bad it might come back
> to haunt them." In terms of fund of information, he was able to identify three cities
> in the world and he knew that "sixty" seconds were in one minute. Mr. Maldonado's
> general level of intelligence appeared to fall within normal limits.

(*Id.*)  Dr. Krabbe found that "Mr. Maldonado's judgment appear[ed] to be sufficient to make

decisions affecting his future and to conduct his own living arrangements efficiently," and that

he appeared to have "adequate insight into his difficulties."  (*Id.*)

Dr. Krabbe found the information provided by Mr. Maldonado appeared to be reliable.

(Tr. 676.)  He also found that Mr. Maldonado's memory, math skills, and general intelligence

fell within adequate limits to manage funds.  (*Id.*)  Dr. Krabbe diagnosed Mr. Maldonado with

Autism Spectrum Disorder and provided the following functional assessment:

> **What is your assessment of the claimant's abilities and limitations in
> understanding, carrying out, and remembering instructions, both one-step
> and complex?**
>
> The claimant performed adequately on a brief abstract reasoning activity, a task to
> assess difficulty understanding instructions. He performed below average on a brief

short-term memory activity, a task to assess difficulty remembering instructions. The claimant performed adequately recalling digits forward, a simple structured task[] to assess short-term memory. He was able to converse effectively to complete the evaluation. He reported problems with learning in school and received special education services, which may lead to difficulties acquiring new information in work settings. He reported no significant problems learning work related tasks.

**What is your assessment of the claimant's abilities and limitations in sustaining concentration and persisting in work-related activity at a reasonable pace?**

The claimant had difficulty completing serial 7s but effectively completed a serial 3s task, which suggests some difficulty with attention and focus. The claimant had no difficulty recalling digits backwards, a simple structured task to assess attention and concentration. He displayed adequate task persistence when answering questions. He displayed no indication of distraction during the evaluation. He reported difficulty remembering appointments and medication. The claimant described symptoms of autism that could result in increased worry and a corresponding decrease in attention and concentration. He did not describe a history of problems with attention and concentration in school. He reported a history of impulsive behavior in school. He did not describe a history of problems with attention and concentration within work environments.

**What is your assessment of the claimant's abilities and limitations in maintaining effective social interaction on a consistent and independent basis, with supervisors, co-workers, and the public?**

The claimant did not describe a significant history of problems with teachers or classmates. The claimant functions within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately relate to co-workers. On past work performance, he did not describe significant problems in responding appropriately to supervision and to coworkers in a work setting. His longest period of employment at one company was 38 days. He interacted appropriately and was pleasant during the evaluation. He has a few friends outside of his family.

**What is your assessment of the claimant's abilities and limitations in dealing with normal pressures in a competitive work setting?**

The claimant endorsed a history of emotional deterioration in response to work pressure. He displayed appropriate responses and affect during the examination when discussing past and current pressures. He reported a history of disciplinary problems in school. He described symptoms of autism that may compromise his ability to respond to work pressures leading to increased emotional instability and withdraw[al]. He has received psychotherapy but has never been psychiatrically hospitalized.

19

(Tr. 676-77.)

### iii.      State Agency Psychological Consultants

On May 2, 2022, state agency psychological consultant Karla Delcour, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 73-75) and mental RFC assessment (Tr. 80-81), addressing the two relevant periods: September 2008 through September 2012 and November 10, 2021, through the date of her opinion (Tr. 73, 75).

In the PRT for the period between September 2008 and September 2012, Dr. Delcour opined that Mr. Maldonado had: no limitations in his ability to understand, remember, or apply information or to concentrate, persist, or maintain pace; and mild limitations in his ability to interact with others or adapt or manage oneself.  (Tr. 73-74.)  She therefore concluded that Mr. Maldonado's mental impairments were not severe for the CIB period of September 2008 through September 2012, and did not complete a mental RFC assessment for that period.  (Tr. 74.)

In the PRT for the period from November 10, 2021, through the date of the opinion, Dr. Delcour opined that Mr. Maldonado had mild limitations in his ability to interact with others and moderate limitations in his ability to: understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt and manage oneself.  (Tr. 75.)  In the RFC, Dr. Delcour opined that Mr. Maldonado could: understand, carry out, and remember simple (1-2 step) instructions; complete 1-2 step tasks in an environment with flexible production standards; maintain effective social interactions with supervisors, co-workers, and the public; and adapt to routine changes in the work environment, but would not do well in a fast-paced, rapidly changing environment.  (Tr. 80-81.)

On reconsideration, state agency psychological consultant Vicki Warren, Ph.D., affirmed Dr. Delcour's PRTs (Tr. 101-03) and mental RFC finding (Tr. 108-110) on August 28, 2022.

20

**D.      Function Reports**

**1.      Plaintiff's Function Report**

On December 1, 2021, Mr. Maldonado completed a function report.  (Tr. 286-93.)  He said that Asperger's Syndrome made it difficult for him to follow instructions and interact with others.  (Tr. 286.)  He also said that his tinnitus made it harder for him to focus.  (Tr. 286, 289.)  He stayed at home most days because of the pandemic.  (Tr. 290.)  On a typical day, he would shower, eat, use the computer, and perform chores, which included mowing the lawn, sweeping, raking, washing bathrooms, and organizing items.  (Tr. 287.)  He would sometimes cook rice or other prepared foods.  (Tr. 288.)  He said he did not drive; he was afraid since driving was a "common cause of death," and also needed his doctor's permission to drive.  (Tr. 289.)  He shopped by phone, mail, online, and in stores for electronics and household items up to three times a month.  (*Id*.)  He said he was capable of paying bills, counting change, handling a savings account, and using a checkbook or money orders, but noted that he did not have a job or much income.  (*Id*.)  His hobbies and interests included 3D art modeling, gaming, watching online videos, and listening to music.  (Tr. 290.)  Except for 3D art modeling, he engaged in these activities daily; it was becoming harder for him do 3D art modeling because his tinnitus made it difficult for him to focus.  (*Id*.)  He talked with others daily in group chats, mostly about gaming.  (*Id*.)  He reported having disagreements with his parents at times.  (*Id*.)  He described his ability to follow written and verbal instructions as "mostly good," and his ability to get along with authority figures as "good."  (Tr. 291.)  He said that the length of time he could pay attention depended on the task, and that his ability to handle stress depended on the type of stress, stating that he handled "emotional stress . . . well."  (Tr. 291-92.)  He reported that he did

not handle changes in routine well, and "[did] not like unexpected changes." (*Id*.) He was "afraid to be among people at [his] home" and was "not as comfortable around guests." (*Id*.)

### 2. Third-Party Function Report

On December 1, 2021, Mr. Maldonado's mother, Angela Maldonado, completed a third-party function report. (Tr. 278-85.) She stated that her son's most limiting medical condition was Asperger's, noting that she had to repeat things to her son on a daily basis. (Tr. 278.) She said her son needed reminders for things such as pulling up his pants and wearing a belt. (Tr. 280.) On a typical day, she said that Mr. Maldonado bathed, used a computer, applied medication on his skin, did some chores, and might go to the bank. (Tr. 279.) He was able to prepare simple meals. (Tr. 280.) The chores he performed included mowing the lawn, cleaning the bathroom, and shoveling with close supervision. (*Id*.) She said her son did not drive; he needed permission from his doctor to get a driver's license due to his seizure disorder and he had a fear of learning to drive. (Tr. 281.) She reported that her son would look online for items he wanted to buy, which primarily consisted of computer-related or electronic items, and then he would go to the store to purchase items. (*Id*.) When at stores, she said her son moved quickly through the store because he did not like to be in stores for a long time. (*Id*.) Mrs. Maldonado reported that her son could pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id*.) With respect to hobbies and interests, Mr. Maldonado reported that her son enjoyed designing computer images/games and was interested in finding a job relating to that type of work. (Tr. 282.) She said he spent hours working on his computer designs. (*Id*.) He would enter his designs into contests and won the most recent contest he entered. (*Id*.) Due to the pandemic, Mrs. Maldonado said their family did not go very many

places, but she said Mr. Maldonado communicated with others online and communicated with her and Mr. Maldonado's father on a daily basis.  (*Id*.)

Mrs. Maldonado said her son needed to be reminded about the importance of finding employment, noting that he had been looking for work for ten years with little success.  (Tr. 280.)  She said her son did not follow written instructions very well and had to have verbal instruction repeated multiple times.  (Tr. 283.)  She reported that he got along very well with authority figures, but it was stressful for him if they had guests at their home; he would stay in his room until guests left.  (Tr. 284.)  He also did not like to have changes in his routine.  (*Id*.)

### E.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the telephonic hearing on April 6, 2023, Mr. Maldonado testified in response to questioning by the ALJ and his counsel.  (Tr. 42-60.)  Mr. Maldonado testified that he lived with his parents and had not lived alone since he turned eighteen.  (Tr. 51.)  He helped around the house with some chores and assisted his parents with using the computer; he could cook but usually did not cook or shop for groceries, and he did not know how to use the washing machine.  (Tr. 51, 54.)  Mr. Maldonado did not have a driver's license because he got "very scared and was reluctant to pursue it" after training with his father and almost bumping into someone.  (Tr. 45, 55-56.)  But he said he was possibly interested in trying again to learn how to drive.  (Tr. 56-57.)

Mr. Maldonado completed some general study college courses over a period of two years.  (Tr. 44-45.)  He said he had only two short work attempts at Marc's, performing stocking and mopping.  (Tr. 46-47.)  The first time, he was let go as part of a mass layoff.  (Tr. 47.)  The second time, his employment ended because he misread the schedule and did not show up to work for three days.  (*Id*.)  He did not recall any issues interacting with others while working at

Marc's.  (*Id*.)  He reported some freelance work mowing lawns, but he said his side activities did not come close to forty hours a week.  (Tr. 48.)

Mr. Maldonado said that he felt anxiety and stress prevented him from being able to work.  (Tr. 48-49.)  He said his mental issues made it hard for him to understand things and make decisions.  (*Id*.)  He felt that his anxiety stemmed from worrying about how he would care for himself in the future if his parents were no longer around to care for him.  (Tr. 52.)  He was not receiving treatment for his mental health issues; he said he sought treatment years earlier for sadness and depression, but he did not "really feel as deeply sad like [he] used to."  (*Id*.)

Mr. Maldonado also said that his tinnitus initially caused debilitating ringing in his ears and the ringing made it difficult for him to concentrate.  (Tr. 49-50.)  He said he tried various treatments for it without success.  (Tr. 50.)  He tried to distract himself from the ringing and had grown somewhat accustomed to it, but the ringing continued.  (*Id*.)

Mr. Maldonado occasionally watched television with his parents, ate meals with them, and helped around the house, but he usually spent most of his time in his bedroom gaming on the computer and watching television shows.  (Tr. 53, 54-55.)  He said that he had tried to develop a video game a number of years earlier, but ultimately abandoned the idea because he did not think his ideas were feasible and did not think it would work out financially.  (Tr. 57-58.)  If Mr. Maldonado went out, it was with his parents.  (Tr. 53-54.)  He sometimes went to stores with them to pick up items or to church events that he found to be mentally relaxing. (*Id*.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 60-64.)  The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's RFC determination (Tr. 17, 61-62) could perform

representative positions in the national economy, including sweeper, kitchen helper, and grocery bagger (Tr. 61-62).  If the hypothetical individual required additional 15-minute breaks, the VE testified that it would be a special accommodation that would have to be pre-negotiated.  (Tr. 62.)  If the individual deteriorated in response to work pressures, and if the deterioration would result in an inability to remain productive throughout the day, such a limitation could make it impossible for the individual to maintain employment.  (Tr. 62-63.)  The VE also testified that an individual could not be off task more than 8 to 10% of the time or be absent more than one day per month and maintain employment.  (Tr. 63.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

With respect to CIB, an adult whose parent is entitled to old age or disability benefits can receive CIB if the "child was under a disability ... at the time he attained the age of 18 or . . . at or prior to the time he attained . . . the age of 22."  42 U.S.C. § 402(d)(1)(G); *see* 20 C.F.R. § 404.350(a)(5); *Jones v. Sec'y of Health & Human Servs.*, 89–1603, 1990 WL 17265, at * 1 n.1 (6th Cir. Feb. 27, 1990) (Section 402(d) "provides that a child of an individual entitled to old age or disability insurance benefits is entitled to Child's Insurance Benefits if he is under a disability (as defined by section 223(d) of the Social Security Act) which began before his twenty-second birthday").

## IV.     The ALJ's Decision

In her April 26, 2023 decision, the ALJ made the following findings:[6]

1.      The claimant had not attained age 22 as of October 1, 1997, the alleged onset date.  (Tr. 13.)

2.      The claimant has not engaged in substantial gainful activity since October 1, 1997, the alleged onset date.  (*Id*.)

3.      The claimant has the following severe impairments: tinnitus of the left ear; epilepsy; psoriasis; psychotic disorder / schizophrenia; pervasive development disorder; obsessive compulsive disorder; communication disorder; major depressive disorder; generalized anxiety disorder; adjustment disorder; migraine headaches; obesity; and autism spectrum disorder.  (*Id*.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-16.)

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds; should never be exposed to unprotected heights, dangerous moving mechanical parts, and commercial motor vehicles; can be exposed to a moderate amount of noise ("moderate" means business offices where typewriters are used, department stores, grocery stores, light traffic, and fast-food restaurants at off hours); can carry out, concentrate, persist, and maintain pace for completing simple, routine, repetitive tasks; can perform work tasks that do not require a specific production rate such as assembly-line work or work that requires hourly quotas; can tolerate occasional changes in a routine work setting; and can frequently interact with others.  (Tr. 17-25.)

6.      The claimant has no past relevant work.  (Tr. 25.)

7.      The claimant was born in 1990 and was 7 years old on the alleged disability onset date.  (*Id*.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability because claimant has no past relevant work.  (*Id*.)

---

[6] The ALJ's findings are summarized.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including: kitchen helper, hand packager, and sweeper. (Tr. 25-26.)

Based on the foregoing, the ALJ determined that Mr. Maldonado had not been under a disability, as defined in the Social Security Act, from October 1, 1997, through the date of the decision.[7] (Tr. 26-27.)

## V.    Plaintiff's Arguments

Mr. Maldonado asserts two assignments of error. First, he argues that the ALJ erred in evaluating the severity of his mental impairments at Step Three. (ECF Doc. 7, pp. 1, 13-19.) Second, he argues that the ALJ erred in evaluating the persuasiveness of consultative examiner Dr. Krabbe's medical opinion, and consequently erred when she adopted an RFC that did not reflect the severity of his mental impairments. (*Id.* at pp. 1, 19-23.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

---

[7] In reaching this determination, the ALJ found that Mr. Maldonado was not disabled prior to the date he attained age 22, in September 2012, and therefore was not disabled for purposes of his CIB application. (Tr. 27.) The ALJ also found that he was not disabled for purposes of his November 2021 SSI application. (*Id.*)

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

29

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: The ALJ Properly Evaluated the Severity of Plaintiff's Mental Impairments at Step Three**

In his first assignment of error, Mr. Maldonado argues that the ALJ erred in evaluating the severity of his mental impairments at Step Three under Listings 12.04, 12.06, and 12.10. (ECF Doc. 7, pp. 1, 13-19.)  Specifically, he asserts that the ALJ minimized or failed to fully consider evidence relevant to his mental limitations, and therefore erred in finding he had only moderate limitations in the domains of (1) interacting with others and (2) concentrating, persisting, or maintaining pace.[8]  (*Id.*)  In response, the Commissioner argues that the ALJ reasonably found Mr. Maldonado had moderate limitations in both domains, made a decision that was supported by substantial evidence, and adequately explained her findings in her Step Three and Four analyses.  (ECF Doc. 9, pp. 10-12.)  In support, the Commissioner highlights the ALJ's finding that the consultative psychological examinations supported no more than moderate limitations in mental functioning, and the state agency psychological consultants' findings that Mr. Maldonado had no more than moderate limitations in mental functioning and did not meet or medically equal listings 12.06, 12.08, or 12.10.  (*Id.* at p. 12.)

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or

---

[8] Mr. Maldonado briefly argues that the evidence also supports a finding of a marked limitation in the domain of adapting or managing oneself, citing Dr. Krabbe's 2022 opinion in support.  (ECF Doc. 7, p. 18.)  The Court finds this underdeveloped argument to be waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).  Further, for the reasons articulated in Section VI.C., *infra*, the Court finds that the ALJ adequately accounted for the cited findings in Dr. Krabbe's opinion.

equals a Listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  That means the claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).

Mr. Maldonado contends that the ALJ erred when she found he did not meet or equal Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and/or 12.10 (autism spectrum disorder).[9]  (ECF Doc. 7, p. 13.)  To meet Listings 12.04 and 12.06, a claimant must meet the criteria set forth in paragraph A and the criteria set forth in either paragraph B or paragraph C.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06.  To meet Listing 12.10, a claimant must meet the criteria set forth in paragraphs A and B.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.10.  The paragraph B criteria for all three mental listings require evaluation of four areas of mental functioning—understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself—and a finding that the plaintiff had extreme limitations in one area or marked limitations in two areas.  20 C.F.R. § 416.920a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.10, 12.00E.

Mr. Maldonado argues that the ALJ erred in evaluating the paragraph B criteria because she found Mr. Maldonado had no more than moderate limitations in the domains of interacting

---

[9] Mr. Maldonado briefly observes that "it is unclear whether [the ALJ] considered listing 12.10 in evaluation of Mr. Maldonado's autism spectrum disorder," but makes no developed argument suggesting that this was a harmful error. (ECF Doc. 7, p. 13.)  Any such argument is therefore underdeveloped and waived.  *See McPherson*, 125 F.3d at 995-96.  Further, the ALJ provided a detailed analysis of the "paragraph B" criteria for Listings 12.04 and 12.06. (Tr. 15.)  Since the same "paragraph B" criteria must be satisfied to meet Listing 12.10, the Court finds any alleged error due to the ALJ's failure to specifically mention Listing 12.10 is harmless and not a basis for remand.

with others and concentrating, persisting, or maintaining pace, when the ALJ should have found

marked limitations in both areas. (*Id.*) The ALJ gave the following explanation in support of her

finding that Mr. Maldonado had moderate limitations in interacting with others:

> Here, the claimant alleged problems getting along with others due to Asperger's and getting into disagreements with his parents at time [*sic*] []. The claimant also indicated that he spent time with others such as online []. At a 2009 consultative examination, the claimant indicated that he socializes with friends []. The claimant was cooperative at a 2011 consultative examination []. The claimant at a 2022 consultative examination the claimant was cooperative and pleasant []. The claimant denied past problems with supervisors or coworkers.

(Tr. 15 (citing Tr. 286-97 (12/1/21 function report), 339-45 (6/23/09 CE report), 375-81 (3/7/11

CE report), 672-77 (4/25/22 CE report)).) The ALJ then explained her additional finding of

moderate limitations in concentrating, persisting, or maintaining pace as follows:

> Here, the claimant alleged problems with focus and concentration []. The claimant also indicated that he used a computer, did chores, could count change, handle a savings account, and use a checkbook and money orders []. The claimant at a 2009 consultative examination was conscious and alert and could repeat seven digits forward and four digits backward []. At a 2011 consultative examination, the claimant had "good" task persistence, attention, concentration, and response to direction and redirection []. At the claimant's most recent consultative examination in 2022, the claimant reported that he could attend to chores and hygiene, shop, and prepare basic meals []. The claimant could recall six digits forward and four digits backward. Although the claimant did not receive mental health treatment, notes showed the claimant was alert [].

(Tr. 16 (citing Tr. 286-97 (12/1/21 function report), 339-45 (6/23/09 CE report), 375-81 (3/7/11

CE report), 672-77 (4/25/22 CE report), 635 (9/28/21 office visit), 735 (1/13/23 office visit)).)

Mr. Maldonado argues first that the ALJ improperly relied on recent evidence to support

her Step Three findings as to CIB benefits, when the relevant period for such benefits was from

September 2008 through September 2012.[10] (ECF Doc. 7, p. 14.) But the ALJ's stated reasons

---

[10] Plaintiff also asserts in a brief and conclusory manner that the ALJ did not provide separate analyses for his CIB and SSI claims, which deprived the Court of the ability to perform a proper review. (ECF Doc. 7, p. 14.) But he identifies no procedural requirement under the operative regulations requiring the ALJ to discuss the two periods separately. The Court finds that the ALJ's written decision makes it clear that there were two separate applications,

for finding moderate limitations in the relevant functional domains were supported by citations to evidence from both the CIB period (2008 to 2012) and the SSI period (2021 to present).  (*See* Tr. 15-16.)  And the ALJ's subsequent discussion of the medical opinions provided further explanation to support her finding of moderate limitations in both periods.  Even though the state agency psychological consultants opined that Mr. Maldonado had no more than mild limitations in mental functioning during the CIB period, the ALJ found the opinions unpersuasive as to that period because "the opinions are not consistent with the multiple consultative examinations the claimant underwent."  (Tr. 24-25 (citing Tr. 375-81 (3/7/11 CE report), Tr. 382-89 (3/5/12 psychological evaluation)).)  The ALJ had already found, in assessing Mr. Maldonado's 2009 and 2011 consultative psychological examinations and Dr. Litwin's 2012 psychological evaluation, that the examination findings were consistent with no more than moderate functional limitations.  (*See* Tr. 21, 22, 23.)  The ALJ's analysis thus does not support Mr. Maldonado's assertion that the ALJ improperly relied on recent records to support her findings as to CIB benefits.  The ALJ explicitly considered and discussed both time periods, and explained her reasons for finding the same limitations were appropriate during both periods.

Mr. Maldonado next argues that the ALJ erred because she did not fully consider the evidence relevant to the CIB and SSI periods when she evaluated the paragraph B criteria.  (ECF Doc. 7, pp. 14-18.)  In support, Mr. Maldonado details various clinical findings and subjective complaints noted in the 2009, 2011, and 2022 consultative examination reports and Dr. Litwin's 2012 psychological examination report, as well as other subjective reports from Mr. Maldonado and his mother, all of which he asserts support greater than moderate limitations.  (*Id.*)  But a

---

involving two separate periods (Tr. 10-11, 24-25, 27), and further finds that the ALJ's failure to fully separate her discussion of each period does not hamper the Court's ability to perform a proper review.

review of the written decision reveals that the ALJ provided a detailed discussion and analysis of both the consultative and psychological examination reports (*see* Tr. 15-16, 20-24) and the subjective complaints made by Mr. Maldonado and his mother (*see* Tr. 15-16, 17-18, 20).

To articulate a decision supported by substantial evidence, the ALJ need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  The ALJ may also rely on information articulated elsewhere the decision to support her findings, and need not rearticulate the information each time it is relevant.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  In other words, "there is no heightened articulation standard where the ALJ's findings are supported by substantial evidence." *Bledsoe*, 165 F. App'x at 411.

Comparing the evidence cited in Mr. Maldonado's brief with the ALJ's written decision, it is clear that the ALJ explicitly addressed much of the identified evidence.  For example, Mr. Maldonado notes Dr. Koricke's observations that Mr. Maldonado stuttered, stammered, and appeared anxious and Dr. Koricke's opinion that anxiety, stuttering, and depression would impact Mr. Maldonado's social interactions and understanding of social cues (ECF Doc. 7, p. 15), all of which the ALJ acknowledged and discussed before concluding that Dr. Koricke's examination findings as a whole were consistent with no more than moderate limitations (Tr. 20-21).  Mr. Maldonado also highlights reports of anxiety and shaking in 2011 and findings of limited interpersonal skills, social awkwardness, and poor self-direction, mental perseverance, and determination in 2012 (ECF Doc. 7, pp. 15, 17), all of which the ALJ acknowledged in her analyses of the 2011 and 2012 psychological examinations before she found the exam findings

34

and related opinions supported no more than moderate limitations (Tr. 21-23).  Mr. Maldonado also highlights other subjective reports made by him and his mother (ECF Doc. 7, p. 16, 17-18), many of which were addressed in the ALJ's lengthy discussion of those reports (Tr. 17-18, 20).

To the extent the ALJ's written decision does not explicitly acknowledge every piece of evidence highlighted in Mr. Maldonado's brief, the Court finds Mr. Maldonado nevertheless has not met his burden to show that the ALJ failed to consider the record as a whole and reach a reasoned conclusion based on the evidence.  For example, the ALJ did not discuss neurologist Dr. Jacobs's observation of stuttered, rapid speech in 2012 (ECF doc. 7, p. 15 (citing Tr. 438[11])), but acknowledges Dr. Koricke's similar observation in 2009 (Tr. 20).  On the whole, the ALJ's written decision reflects that she considered the subjective reports of Mr. Maldonado and his mother, the clinical findings and opinions of three consultative examiners and an independent psychological examiner, the opinions of two state agency consultants as to Mr. Maldonado's functioning during both the CIB and SSI periods, and the fact that Mr. Maldonado "did not receive mental health treatment, but mental status notes during the physical treatment were fairly unremarkable," in support of her ultimate conclusion that the evidence supported a finding of moderate limitations in all four categories of mental functioning.  (Tr. 15-25.)

Mr. Maldonado also argues that the ALJ erred when she did not discuss the 2013 "examination by psychiatrist Dr. Ruedrich, which was outside the Childhood Disability Benefit window by less than six months," which he asserts "was relevant to the period at issue, as it related to Mr. Maldonado's longstanding condition evident between 2008 and 2012."  (ECF Doc. 7, p. 15.)  In support, he cites to the Sixth Circuit's observation in *Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473 (6th Cir. 2018), that "post-date-last-insured medical evidence generally

---

[11] The brief cites Tr. 483, but this appears to be an inadvertent transposition of numbers.  (ECF doc. 7, p. 15.)

has little probative value unless it illuminates the claimant's health before the insurance cutoff date." (ECF Doc. 7, p. 15 (citing *Grisier*, 721 F. App'x at 477).) The Commissioner responds that the ALJ's failure to discuss the post-CIB-period evidence was not harmful error since the relevant psychiatric examination was conducted "five months after the period relevant to child disability benefits" and the report "did not identify limitations or restrictions that would affect the substantial evidence supporting the ALJ's findings." (ECF Doc. 9, p. 14, n. 4.)

The Sixth Circuit has acknowledged that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *Grisier*, 721 F. App'x at 477 (quoting *Strong v. Soc. Sec. Admin.*, 88 Fed.Appx. 841, 845 (6th Cir. 2004)). Nevertheless, consistent with Plaintiff's argument, the Sixth Circuit has also recognized that evidence post-dating the relevant disability period *may* have probative value "if it illuminates the claimant's health before the insurance cutoff date." *Id.* (citing cases); *cf. DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) (explaining that the court does "not endorse the position that all evidence or medical records predating the alleged date of the onset of disability . . . are necessarily irrelevant or automatically barred from consideration," and "recogniz[ing] that evidence . . . predating the onset of disability, when evaluated *in combination with other evidence*, may help establish disability") (emphasis in original).

Mr. Maldonado argues that the ALJ erred when she failed to address Dr. Ruedrich's 2013 examination findings and medical opinion, even though the examination report post-dated the CIB period by five months, because the report evidences: concerns from Mr. Maldonado's parents regarding his isolation, unwillingness to leave home, and extreme anxiety; clinical findings of poor eye contact, psychomotor anxiety, significant stutter, flattened affect, depressed mood, idiosyncratic associations, and distraction on examination; Mr. Maldonado's reports of

36

auditory hallucinations; and the reports of his parents that he talked to himself, laughed out of context, and demonstrated bizarre thinking.  (ECF Doc. 7, pp. 15-16, 17.)

This argument is unpersuasive for several reasons.  First, for those subjective reports and clinical findings that are consistent with the timely evidence that was discussed and considered by the ALJ—like evidence of significant anxiety, stuttering, or depression—there is no error in a failure to discuss duplicative evidence that post-dates the relevant period.  Conversely, for those reports and findings that are distinct from the timely evidence discussed by the ALJ—like reports of auditory hallucinations—the evidence does not clearly establish that those reports relate back to the CIB period.  (*See* Tr. 392.)  And even if the reports could be shown to relate back, Mr. Maldonado has failed to demonstrate that the ALJ's failure to specifically discuss those reports deprived her Step Three findings of the support of substantial evidence.  Although Dr. Ruedrich recommended further psychological testing, antipsychotic and/or antidepressant medications, work with local developmental disability programs for vocational or residential opportunities, and further consultation between Dr. Ruedrich, Mr. Maldonado, and his parents (Tr. 396-97), there is no evidence that Mr. Maldonado engaged in any such psychiatric treatment interventions following the recommendations in the 2013 evaluation.  And the 2022 consultative examination does not evidence any current or ongoing issues with hallucinations or psychosis.  (Tr. 672-77.) Ultimately, the ALJ considered the findings in four psychological examinations, the opinions of two psychological consultants, and Mr. Maldonado's lack of mental health treatment in reaching her determination that Mr. Maldonado had no more than moderate limitations in mental functioning.  Given all these considerations, the Court finds Mr. Maldonado has not met his burden to show that the ALJ's failure to discuss a psychological examination post-dating the CIB period by five months deprived her Step Three findings of the support of substantial evidence.

37

Finally, Mr. Maldonado argues that the ALJ's explanations at Step Three lacked the support of substantial evidence because the ALJ did not clearly explain how she considered the "supportability" and "consistency" factors in determining the persuasiveness of the various medical opinions.  (ECF Doc. 7, pp. 16-17.)  As discussed in greater detail in Section VI.C., *infra*, "supportability" is the extent to which a medical source's objective findings and supporting explanations substantiate or support the findings in his or her medical opinion, *see* 20 C.F.R. § 416.920c(c)(1), and "consistency" is the extent to which the medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record, *see* 20 C.F.R. § 416.920c(c)(2).  Even without delving deeply into opinion findings that were not appropriately challenged on appeal,[12] it is clear that the ALJ's analysis of the consistency and supportability of the psychological examination reports did not undermine her Step Three analysis.  If anything, the ALJ's opinion analysis helped to elucidate her Step Three reasoning.

In addressing Dr. Koricke's 2009 opinion that Mr. Maldonado had a "moderately impaired" ability to relate to others and a "generally not impaired" ability to maintain attention, concentration, persistence, and pace, the ALJ accurately characterized the opinions as "vague" and explained: "[b]ecause of their vagueness, it is difficult to evaluate the opinions for consistency."  (Tr. 20-21.)  Nevertheless, the ALJ found the opinions were not consistent with greater limitations than those in the RFC, and that Dr. Koricke's supporting examination findings were also "consistent with no more than moderate limitation."  (Tr. 21.)

In addressing Dr. Gruenfeld's 2011 opinion that Mr. Maldonado was "not likely to have problems" with attention, concentration, persistence, and pace and displayed "no evidence of

---

[12] Apart from his second assignment of error, relating to Dr. Krabbe's 2022 consultative examination report, Mr. Maldonado has not clearly articulated or adequately developed any challenges to the ALJ's persuasiveness findings regarding other medical opinions, and any such argument is deemed waived.  *See McPherson*, 125 F.3d at 995-96.

problems with attention and concentration during th[e] evaluation, even as [he] was obviously experiencing problems with anxiety," and his failure to identify any limitations in Mr. Maldonado's ability to respond to supervision and coworkers, the ALJ explained that Dr. Gruenfeld's opinions were at times "just summations of the interview and d[id] not specify the claimant's exact limitations or abilities" and further concluded that his findings of no limitations "while supported[,] [we]re not consistent with the evidence."  (Tr. 21-22.)  Despite finding Mr. Maldonado was more limited than Dr. Gruenfeld's opinions would support, the ALJ nevertheless found "for the reasons noted by [Dr. Gruenfeld] in his opinion notes, the claimant's limitations in any area are not more than moderate."  (Tr. 22.)

In addressing Dr. Litwin's 2012 opinion that Mr. Maldonado had functional limitations including poor self-direction, low math skills, poor interpersonal skills with social awkwardness, poor mental perseverance and determination, and limited work skills, the ALJ accurately characterized the limitations as "vague" to the extent that they constituted medical opinions at all, making them "difficult to analyze . . . for consistency," and also noted the opinions were not supported by citations linking the findings to evidence.  (Tr. 22-23.)  Nevertheless, the ALJ found the opinions did not appear to support greater limitations than those in the RFC.  (Tr. 23.)

In all, the ALJ's analysis of the examining psychological opinions accurately characterized the opinions as vague, addressed their supportability and consistency, and explicitly concluded based on supporting evidence that the examination findings and medical opinions each supported a finding of no more than moderate limitations in all categories of mental functioning.[13]  Mr. Maldonado has not shown that the ALJ's analysis of the examining medical opinions deprived her Step Three findings of the support of substantial evidence.

---

[13] The ALJ's analysis of Dr. Krabbe's 2022 examination report is addressed in Section VI.C., *infra*.

In challenging the ALJ's findings at Step Three, Mr. Maldonado has failed to identify evidence that would deprive the ALJ's findings of the support of substantial evidence.  Instead, he describes evidence that he believes supports a finding of marked limitations in two areas of mental functioning.  (ECF Doc. 7, pp. 13-19.)  But the appropriate inquiry is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

For all of the reasons set forth above, the Court finds that the ALJ's Step Three findings have the support of substantial evidence, and Mr. Maldonado has not met his burden to establish otherwise.  Accordingly, the Court finds the first assignment of error to be without merit.

**C.     Second Assignment of Error: The ALJ Adequately Assessed the Persuasiveness of Dr. Krabbe's Opinion and Accounted for Plaintiff' Mental Impairments in the RFC**

In his second assignment of error, Mr. Maldonado argues that the ALJ erred when she found the 2022 opinion of consultative examiner Dr. Krabbe was not persuasive and adopted an RFC that did not "reflect Mr. Maldonado's inability to withstand work pressures."  (ECF Doc. 7, pp. 1, 19-23.)  Specifically, he argues that the ALJ did not adequately address supportability and consistency when evaluating the persuasiveness of Dr. Krabbe's statement that Mr. Maldonado had described symptoms of autism that might compromise his ability to respond to work pressures and lead to increased emotional instability and withdrawal.  (*Id*. at pp. 19-20; *see* Tr. 24.)  As to supportability, Mr. Maldonado contends: "Dr. Krabbe's opinion was supported by his findings and explanations."  (*Id.* at p. 21.)  And as to consistency, he contends: "Dr. Krabbe's

opinion is also consistent with the evidence of record from other medical and nonmedical sources." (*Id*.)  The Commissioner argues in response that the ALJ properly considered both the supportability and consistency of Dr. Krabbe's opinion and included mental RFC limitations that would minimize the likelihood of work pressure.  (ECF Doc. 9, pp. 14-16.)

### 1.    Legal Framework for Evaluating Medical Opinions

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 416.920c(a).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 416.920c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 416.920c(a), 416.920c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 416.920c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).  In other words,

41

"consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

## 2.    The ALJ Appropriately Evaluated Dr. Krabbe's Medical Opinion

The ALJ summarized Dr. Krabbe's functional assessment findings at length and then explained her conclusion that those findings were not persuasive as follows:

> The opinions are vague and mostly just summations of the interview. These summations, however, do not support greater limitations than those found above. For instance, the claimant endorsed problems with autism but explained appropriate responses and affect during the examination. The results from the examination are consistent with the record as a whole. The claimant did not receive mental health treatment, but notes from physical examinations were fairly unremarkable. The claimant was alert and cooperative on January 21, 2022 []. The claimant was alert and pleasant on September 28, 2021 [].

(Tr. 23-24 (citations omitted) (emphasis added).)  Mr. Maldonado argues that this explanation fails to adequately address the factors of supportability and consistency.  The Court disagrees.

With respect to supportability—the extent to which a medical source's objective findings and supporting explanations substantiate or support his opinion findings—the ALJ accurately described Dr. Krabbe's opinions as "vague and mostly just summations of the interview."  (Tr. 24.)  As to Mr. Maldonado's ability to deal with work pressures, Dr. Krabbe had opined:

> The claimant endorsed a history of emotional deterioration in response to work pressure. He displayed appropriate responses and affect during the examination when discussing past and current pressures. He reported a history of disciplinary problems in school. He described symptoms of autism that may compromise his ability to respond to work pressures leading to increased emotional instability and withdraw[al]. He has received psychotherapy but has never been psychiatrically hospitalized.

(Tr. 677; *see* Tr. 24 (quoting same).)  Consistent with the ALJ's analysis, these findings primarily summarize Mr. Maldonado's reported history, clinical findings on examination, and subjective symptom reports.  The closest thing to an opinion as to Mr. Maldonado's functional

42

abilities or limitations is the statement that his reported symptoms "may compromise his ability to respond to work pressures leading to increased emotional instability and withdraw[al]."[14] (*Id.*) A general observation that symptoms "may" compromise his ability to respond to work pressures by leading to "increased" emotional instability and withdrawal gives very little information regarding what Mr. Maldonado "can still do despite [his] impairments" or the specific impact of any "impairment-related limitations or restrictions" in his ability to perform the mental demands of work. 20 C.F.R. § 416.913(a)(2). Further, the ALJ found that even the summarized findings provided by Dr. Krabbe do not support greater limitations than those provided for in the mental RFC, citing Dr. Krabbe's observation of "appropriate responses and affect" when discussing past and present pressures. (Tr. 24.) Thus, the ALJ adequately addressed the supportability of Dr. Krabbe's opinion regarding Plaintiff's ability to deal with work pressure.

With respect to consistency—the extent to which Dr. Krabbe's opinion findings are consistent with evidence from other medical and nonmedical sources—the ALJ also noted that Dr. Krabbe's examination findings were "consistent with the record as a whole," which indicated that Mr. Maldonado "did not receive mental health treatment" and presented as "fairly unremarkable" during physical examinations, specifically citing to two such exams. (Tr. 24.) Thus, the ALJ adequately addressed the consistency of Dr. Krabbe's opinions as to Plaintiff's ability to deal with work pressure.

Mr. Maldonado argues that Dr. Krabbe's opinion was both supported by his own findings and explanations and consistent with other evidence of record. (ECF Doc. 7, pp. 21-22.) In

---

[14] The governing regulations define medical opinions as "statement[s] from a medical source about what [a plaintiff] can still do despite [his] impairment(s) and whether [he] ha[s] one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work, or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2).

support, he notes his own limited eye contact and flat affect during the examination, symptoms he reported to Dr. Krabbe, and other record evidence showing subjective symptom reports from him and his mother.  (*Id.*)  But the ALJ acknowledged his flat affect on examination and numerous subjective reports of symptoms.  (*See, e.g.,* Tr. 17-18, 20, 23-24.)  The question before this Court is not whether there is substantial evidence to support Mr. Maldonado's preferred interpretation of the medical opinion evidence.  Instead, the question is whether the ALJ lacked substantial evidence to support her contrary findings.  *See Jones*, 336 F.3d at 477.  The Court finds Mr. Maldonado has not met his burden to show that the ALJ's persuasiveness findings lacked the support of substantial evidence or were otherwise inadequately articulated.

The Court additionally finds that Mr. Maldonado has not met his burden to show that the ALJ's persuasiveness findings regarding his ability to deal with work pressures led her to adopt a mental RFC that did not reflect the severity of his limitations in dealing with work pressures.

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  Here, the ALJ found that Mr. Maldonado had the mental RFC to: carry out, concentrate, persist, and maintain pace for completing simple, routine, repetitive tasks; perform work tasks that do not require a specific production rate such as assembly-line work or work that requires hourly quotas; tolerate occasional changes in a routine work setting; and frequently interact with others.  (Tr. 17.)  The Commissioner accurately asserts that a number of these limitations may aid in "minimiz[ing] the likelihood of work pressure." (ECF Doc. 9, p. 14.)  By finding Mr. Maldonado capable only of performing "simple, routine, repetitive tasks" that "do not require a specific production rate" in a "routine work setting" that

does not require more than "occasional changes" (Tr. 17), the ALJ adopted a mental RFC that very specifically accounted for limitations in the ability to deal with normal pressures in a competitive work setting.  This is consistent with the ALJ's earlier finding that Mr. Maldonado had moderate limitations in the ability to adapt and manage himself (Tr. 16), and also adequately accounted for the vague language in Dr. Krabbe's opinion suggesting that Mr. Maldonado "may" have certain "increased" symptoms that interfere with his response to work pressures (Tr. 677). In this context, the Court finds that Mr. Maldonado has failed to demonstrate that that the ALJ's mental RFC findings lacked the support of substantial evidence or were inadequately articulated.

For all of the reasons set forth above, the Court finds that the ALJ's Step Four findings have the support of substantial evidence, and Mr. Maldonado has not met his burden to establish otherwise.  Accordingly, the Court finds the second assignment of error to be without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.


April 14, 2025


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge